AMERICAN TRANSPORTATION CO v. INSURANCE COMPANY
OF NORTH AMERICA.

1. CARRIERS—INSURANCE—FORWARDERS.
   In action against carrier's insurer for subrogation to claim for
   loss of goods in transit, evidence *held*, to sustain admission
   in declaration that plaintiff was only a forwarder of freight
   and not a carrier thereof as claimed.

2. SAME—FORWARDERS—STATUTORY SUBROGATION.
   The statutory subrogation of a common carrier required to
   compensate a consignee for loss or damages to goods being
   transported on a through bill of lading is confined to carriers,
   and a freight forwarder is not a carrier (49 USCA Supp.
   1940, §§ 20[11], 315, 319).

3. SAME—SHIPPERS—FORWARDERS.
   A common carrier is obliged to treat the forwarder of freight as
   the shipper and may discriminate neither against nor in favor
   of the forwarder but must treat it on a basis of equality
   with all other shippers.

4. SAME—FORWARDERS—COLLECTION OF LESS THAN CARLOAD SHIP-
   MENTS.
   A forwarder which collects less than carload shipments from
   various shippers to make up a full carload and give shippers
   the benefit of the lower full carload rate was not a carrier
   by virtue of the fact that it carried the goods from one side
   of the loading dock to the other, hence it was not entitled to
   a carrier's statutory subrogation for loss or damage to goods
   by previous carrier (49 USCA Supp. 1940, §§ 20[11], 315,
   319).

5. APPEAL AND ERROR—QUESTIONS REVIEWABLE—SUBROGATION.
   Whether or not forwarder of freight who paid consignee for
   loss of goods in transit was entitled to subrogation against
   insurer of carrier which was carrying the goods when the loss
   occurred independently of statute is not decided where claim
   was not in declaration and request for leave to amend was
   refused without objection.

Appeal from Wayne; Miller (Guy A.), J. Submitted October 16, 1941. (Docket No. 91, Calendar No. 41,580.)  Decided January 5, 1942.

Action by American Transportation Company, a Michigan corporation, against Insurance Company of North America, a foreign corporation, for reimbursement for goods lost in transit by defendant's insured, a common carrier.

*Lightner, Crawford, Sweeny, Dodd & Mayer,* for plaintiff.

*Hill, Hamblen, Essery & Lewis* (*Thomas H. Adams* and *Austin Fleming,* of counsel), for defendant.

BUTZEL, J.  Two shipments, each covered by a through bill of lading, are involved in the case at bar.  The bills are from the printed commercial stationery of Delco-Remy Division (General Motors Corporation), Anderson, Indiana, and are identical in content, except as to property covered, and details consequent thereupon.  Photostatic copies thereof were attached to, and incorporated in, the declaration; they were admitted in evidence when counsel for defendant admitted their execution and authenticity.  We quote the material provisions of Exhibit "A," italicizing the words which were handwritten in the blanks, leaving in roman type the words which were printed:

"(Uniform Domestic Straight Bill of Lading, adopted by Carriers in Official, Southern, Western and Illinois Classification territories, March 15, 1922, as amended August 1, 1930.)  *  *  *

"*American Carloading* Company Received, subject to the classifications and tariffs in effect on the

date of the issue of this Bill of Lading, from Delco-Remy Division, General Motors Corporation, * * * the property described below, * * * marked, consigned, and destined as indicated below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under this contract) agrees to carry to its usual place of delivery at said destination, if on its own road or its own water line, otherwise to deliver to another carrier on the route to said destination. * * *
"Consigned to *United Motor Service 175 Ipswich St.*
"Destination *Boston* State of *Mass.*"

Then followed a description of the goods. At the bottom appeared the following:

"Delco-Remy Division, General Motors Corporation, Shipper, Per *Signed V. Carpenter* Agent * * * Permanent post-office address of shipper, Anderson, Indiana." (The word "signed" was typewritten.)

Just above the signature on behalf of consignor, there appeared the following legend, produced by the impression of a rubber stamp, not a part of the printed form:

"This shipment is tendered and received subject to the terms and conditions of the carrier's bill of lading as shown in the tariff and classification filed with the interstate commerce commission naming and covering the rate or rates lawfully applicable to this shipment."

This legend was signed: *"Clover Leaf F. Williams."* The words "American Carloading," "United Motor Service," "175 Ipswich St.," "Boston," "Mass.," and "V. Carpenter" were written in one hand; the words "Clover Leaf" and "Williams" in another.

Clover-Leaf Motor Truck Transportation Company, Inc., actually received the goods from the consignor at Anderson, Ind., and carried them in its trucks to Detroit, Michigan, where it unloaded them at the dock jointly used by American Carloading Company and its subsidiary corporation, the plaintiff. During the haul from Anderson to Detroit, a part of each shipment was lost. Plaintiff then shipped the goods from Detroit to New York City. Counsel agree that in one bill of lading covering that leg of the haul plaintiff was both consignor and consignee, and the Grand Trunk and Lehigh Valley railroads were the carriers, although that bill of lading was not introduced in evidence. Testimony shows that after a brief stay at the New York City loading dock, the goods were carried from New York City to Boston by the Holland Transportation Company, which delivered them in the latter city to the consignee named in the through bill. Consignee immediately complained to plaintiff of the shortage, and plaintiff paid consignee the amount thereof. Plaintiff sought reimbursement from Clover-Leaf Motor Truck Transportation Company, and, after Clover-Leaf went into bankruptcy, filed a claim in the bankruptcy proceedings, but never received anything, as Clover-Leaf's estate contained no assets. Plaintiff now sues defendant, Clover-Leaf's insurer, declaring that under the Federal Motor Carrier Act, 1935, it became subrogated to the rights of the consignee, by virtue of its having paid the consignee's claim against Clover-Leaf, against Clover-Leaf's insurer.

The trial judge denied recovery on the ground that the bill of lading ran from the American Carloading Company, or Clover-Leaf, but not from plaintiff American Transportation Company (a subsidiary of American Carloading Company), and

that parol evidence could not be introduced to vary the contents of the written instrument. Plaintiff claims that this ruling was error. Inasmuch as defendant must prevail on another ground, it becomes unnecessary to discuss the question.

The provisions of the Federal statutes on which plaintiff relies are as follows:

Motor Carrier Act, 1935, § 215:

"The [interstate commerce] commission may, in its discretion and under such rules and regulations as it shall prescribe, require any such common carrier [by motor vehicle] to file a surety bond, policies of insurance, qualifications as a self-insurer, or other securities or agreements, in a sum to be determined by the commission, to be conditioned upon such carrier making compensation to shippers and/or consignees for all property belong [*sic*] to shippers and/or consignees, and coming into the possession of such carrier in connection with its transportation service. Any carrier which may be required by law to compensate a shipper and/or consignee for any loss, damage or default for which a connecting motor common carrier is legally responsible shall be subrogated to the rights of such shipper and/or consignee under any such bond, policies of insurance, or other securities or agreements, to the extent of the sum so paid." (Act of August 9, 1935, chap. 498, § 215; 49 Stat. at L. 557, 49 USCA Supp. 1940, § 315.)

The requirement by law imposed upon initial (and delivering) carriers to answer for loss, damage or default of connecting carriers was imposed on common carriers by railroad by the Carmack amendment, *infra,* which added section 20(11) to the interstate commerce act. The provisions of this section have been extended to initial common carriers by motor vehicle by the following:

Motor Carrier Act, 1935, § 219:

"The provisions of section 20(11) of [the inter-state commerce act] shall apply with like force and effect to receipts or bills of lading of common car-riers by motor vehicle." (Act of August 9, 1935, chap. 498, § 219; 49 Stat. at L. 563, 49 USCA Supp. 1940, § 319.)

The section referred to (section 20[11]), being the Carmack amendment, as amended, reads:

Interstate Commerce Act, as amended, section 20(11) as added and amended:

"SEC. 20(11). Any common carrier   *   *   * subject to the provisions of this act receiving prop-erty for transportation [in interstate commerce] *   *   *   shall issue a receipt or bill of lading there-for, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier   *   *   *   to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, *  '*  * and any such common carrier   *   *   *   so receiving property for transportation [in interstate com-merce]   *   *   *   shall be liable to the lawful holder of said receipt or bill of lading or to any party en-titled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full ac-tual loss, damage or injury to such property caused by it or by any such common carrier   *   *   *   to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lad-ing." (Act of April 23, 1930, chap. 208; 46 Stat. at L. 251, 49 USCA Supp. 1940, § 20[11].)

Acting under section 215, *supra,* the commission on August 3, 1936, adopted a regulation requiring

motor carriers' insurance policies to bear an indorsement in favor of shippers and/or consignees; accordingly the policy in suit bears such indorsement.

The statutory subrogation to which plaintiff claims it is entitled is limited to "any *carrier* which may be required by law to compensate a  *  *  * consignee," et cetera. It follows that unless plaintiff can bring itself within the category of carrier, its claim that it was initial carrier and consequently liable for the loss to the consignee, although such loss occurred while the goods were in the possession of another carrier (Clover-Leaf), which is alleged to have been a connecting carrier, must necessarily fail. In paragraph 13 of its declaration plaintiff states as a conclusion of law that it was a carrier, and formulates its claim in language closely following the final sentence of section 215. But in the earlier paragraphs of the declaration (especially in paragraphs 3, 4, 6, and 7) plaintiff makes it clear that it was only a *forwarder* as to these shipments throughout their entire course from Anderson to Boston, and the testimony bears out this admission.

An understanding of the nature of the business of freight forwarders is essential to a clear understanding of the issues of this case. The following description is the most recent yet given by the Supreme Court of the United States, in an opinion by Mr. Justice Black (*United States* v. *Chicago Heights Trucking Co.*, 310 U. S. 344, 345, 346 [60 Sup. Ct. 931, 84 L. Ed. 1243]):

"Forwarders utilize common carriers by rail and motor truck to transport goods owned by others. They solicit and obtain many small shipments, from various points within an area, and cause them to be carried in less than truckload or carload lots to a concentration center within the area. There they are assembled by the forwarder for further trans-

portation in truckload or carload lots.   Although the forwarder gives owners of individual small shipments his own contract corresponding in form to through bills of lading and assumes responsibility for safe through carriage, the forwarder customarily arranges for the pickup, assembly and transportation of the shipments by carriers for hire. And the forwarders, not the owners of the goods, select the carriers and route the shipments.   Upon arrival of a truckload or carload of the assembled small shipments at a distribution center, the bulk shipment is broken up, the forwarder separates and takes possession of the original small shipments and arranges, where necessary, their further carriage to their various final destinations in the area served by the particular distribution point.   In this final carriage of the small shipment to its ultimate destination, the forwarder again utilizes carriers for hire to move these less than truckload or carload lots.   Thus, forwarders may use the service of carriers to assemble shipments of less than truckload or carload lots at their concentration center, to transport the assembled truckload or carloads to a distribution center and to carry the broken up small shipments beyond their break-bulk distribution center.

"The forwarding business has been built upon the expectation that a material part of the transportation which it causes to be provided for small shippers can by consolidation of small shipments be obtained at truckload or carload rates.   For the forwarders' business was originally made profitable because it could operate upon the margin of profit represented by the difference between railroad carload rates paid by the forwarder and the higher rates, approximating less than carload rates, which the forwarder charged the owner of a shipment."

The carrier is obliged to treat the forwarder as the shipper (*Great Northern R. Co.* v. *O'Connor,*

232 U. S. 508, 514 [34 Sup. Ct. 380, 58 L. Ed. 703]), and may discriminate neither against (*I. C. C. v. Delaware, Lackawanna & Western R. Co.,* 220 U. S. 235 [31 Sup. Ct. 392, 55 L. Ed. 448]) nor in favor of (*United States v. Chicago Heights Trucking Co., supra*), forwarders, but must treat them on a basis of equality with all other shippers.

The decision in *Acme Fast Freight, Inc., v. United States,* 30 Fed. Supp. 968, rendered by a three-judge court and affirmed *per curiam* by the Supreme Court of the United States, 309 U. S. 638 (60 Sup. Ct. 810, 84 L. Ed. 993), and approved in *United States v. Chicago Heights Trucking Co., supra,* 350, is ample authority for the proposition that forwarders are not carriers within the meaning either of the interstate commerce act or of the motor carrier act, and for the further proposition that forwarders do not come within the purview of either act under any statutory classification, not even those of express companies or transportation brokers.

Accepting plaintiff's version as far as the goods in question are concerned, it was not a carrier. It simply arranged with independent carriers to collect less than carload shipments from various shippers, which it gathered together to make up full carloads, and thus gave shippers the benefit of the lower full carload rate. In the present instance, the Clover-Leaf brought the goods by motor truck to Detroit whence they were shipped with other goods thus assembled into carload lots via the Grand Trunk and Lehigh Valley railroads. Neither the American Carloading Company nor plaintiff were carriers in this transaction. The most that was done was that possibly one of them carried the goods from one side of the loading dock to the other.

Since, as to these shipments, plaintiff bore the re-

lation of forwarder and not that of carrier, it cannot claim the statutory subrogation which in terms is extended only to carriers.

Plaintiff raises the additional point that since it was at least forwarder, it was obliged to reimburse the consignee, since a direct contractual relationship existed between it as forwarder on the one hand and the consignor and consignee on the other hand, and hence argues that its action in paying the consignee's claim was not that of a volunteer, but an adequate basis for subrogation upon familiar general principles of law, independent of the statute. There is much plausibility in this claim, but we do not pass upon it, as it is nowhere included in plaintiff's declaration; he was refused his request for leave to amend, and he has raised no objection on appeal to the action of the court in refusing his request for leave to amend.

At the close of plaintiff's case defendant moved for a judgment on the evidence and such judgment was properly rendered. The evidence did not make out a case for plaintiff.

The judgment of the trial court is affirmed, with costs to defendant.

CHANDLER, C. J., and BOYLES, NORTH, STARR, WIEST, BUSHNELL, and SHARPE, JJ., concurred.